APPEARANCES
 * * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms with some modifications the Opinion and Award of the Deputy Commissioner.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as: *Page 2 
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the Workers' Compensation Act (hereinafter "Act").
2. At all relevant times, an employer-employee relationship existed between Plaintiff and Defendant-Employer.
3. At all relevant times, Defendant-Employer was insured for injuries sustained under the Act by Hanover Insurance Company, Inc.
4. The parties submitted a package of medical records relating to Plaintiff's knee, shoulder, arm and wrist injuries and treatment, marked Stipulated Exhibit #2. The parties transmitted supplemental medical records on February 8, 2006.
5. The parties submitted a package of medical rehabilitation reports, marked Stipulated Exhibit #3.
6. The parties submitted two packages of Industrial Commission forms; I.C. No. 298275, was marked Stipulated Exhibit #4 and I.C. No. 365167, was marked as Stipulated Exhibit #5.
7. The transcript of a recorded statement with Plaintiff's former supervisor, Charles "Chuck" Caldwell, is Stipulated Exhibit #6.
8. The average weekly wage is stipulated to be $653.80. Defendants have appropriately paid compensation through the date of hearing before the Deputy Commissioner.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT a. Knee Injury
1. On the date of hearing before the Chief Deputy Commissioner, Plaintiff was 48 years of age, having a date of birth of July 9, 1957. On or about August 1, 2000, Defendant-Employer employed Plaintiff as a maintenance supervisor for its ninety single-family rental homes and one ten-unit apartment building.
2. On or about January 17, 2002, Plaintiff was moving a refrigerator out of a rental home with help from his supervisor, Charles "Chuck" Caldwell. As Plaintiff was exiting down the steps from the house while carrying the refrigerator, his left foot slipped on the seedpod of a sweet gum tree. Plaintiff twisted his left knee with an immediate onset of pain. Mr. Caldwell witnessed the incident, but did not report the injury because he did not typically prepare paperwork for work-related injuries.
3. When Plaintiff's knee did not improve over the weekend, he sought treatment from his family physician, Dr. T. Hayes Woollen with Cotswold Medical Clinic. Dr. Woollen immediately referred Plaintiff to Charlotte Orthopedic Specialists, where Dr. Leon A. Dickerson, Jr., treated Plaintiff and released him to sedentary employment, which Defendants did not offer.
4. Plaintiff reported his January 17, 2002 injury as being work-related, but Defendants directed him to file the claim under his health insurance. Defendants later reimbursed Plaintiff's out of pocket medical expenses not paid by his health insurance.
5. Plaintiff was treated conservatively for his knee pain with the use of a knee immobilizer and medications. An MRI indicated potential damage to the medial meniscus, but was inconclusive. Plaintiff was diagnosed, in part, with patellofemoral arthrosis. It is *Page 4 
undisputed that Plaintiff's arthrosis likely preexisted Plaintiff's knee injury, but the injury made the arthrosis symptomatic.
6. Dr. Roy Majors, also of Charlotte Orthopedic Specialists, treated Plaintiff's knee with a steroid injection and lidoderm patches. The treatment was largely successful in relieving his symptoms and Plaintiff was able to return to work with Defendants at full employment duties.
7. Defendants contend that no injury by accident occurred because: (a) Plaintiff did not see the seedpod, but he simply assumed that to be the case because he claimed other seed pods were in the area; and (b) Plaintiff's medical records failed to denote a seedpod as the mechanism of injury. The greater weight of the evidence reveals, however, that Mr. Caldwell, Plaintiff's supervisor at the time of the incident, gave a recorded statement that confirms Plaintiff's report of injury even though Mr. Caldwell could not recall the date of Plaintiff's injury.
8. Based on the greater weight of the evidence, the Full Commission finds that Plaintiff sustained an injury by accident to his left knee on or about January 17, 2002, when he accidentally stepped on a seedpod while moving a refrigerator for Defendant-Employer. Defendants were not prejudiced by Plaintiff's delay in filing the Form 18 as they had actual notice of the injury. Plaintiff's delay in filing the Form 18 is excusable as he followed the direction of his employer.
9. Plaintiff's twisting of his knee while moving a refrigerator for Defendant-Employer caused Plaintiff's need for medical treatment for his January 17, 2002 injury. *Page 5 
 b. First Shoulder Injury
10. On September 13, 2002, Plaintiff sustained an admittedly compensable injury by accident when he fell from a ladder onto concrete. As Plaintiff fell, he reached to grab a window ledge and caught his right arm. He was injured over most of his right side, including his hand, wrist, elbow and shoulder, as well as his left hand.
11. Defendants accepted liability for this September 13, 2002 injury by filing a Form 60 admission of employee's right to compensation.
12. Dr. Woollen initially treated Plaintiff, but referred him to Dr. Jerry Barron principally for treatment of right shoulder symptoms. Dr. Barron diagnosed Plaintiff with an acute traumatic rotator cuff tear and prescribed surgery, which was performed on November 14, 2002.
13. Plaintiff began to express symptoms of anxiety, depression, insomnia and feelings of being "trapped," within six weeks of the required wearing of an arm sling after his shoulder surgery. His emotional symptoms continued thereafter due to his ongoing pain, inability to function at his prior level and uncertainty about his future. Dr. Barron referred Plaintiff back to Dr. Woollen for treatment of his depression with medication.
14. Dr. Woollen prescribed various medications, including Lexapro, Effexor, and Zoloft, which Plaintiff continues to take.
15. Plaintiff participated in physical therapy after the shoulder surgery. In early 2003, Plaintiff developed numbness, tingling and pain in his right hand, wrist and elbow and in his left wrist. Dr. Barron referred Plaintiff to Dr. David Baker, an orthopedic surgeon specializing in treatment of the hand. On May 12, 2003, Dr. Baker performed a decompression of Plaintiff's *Page 6 
ulnar nerve at the right elbow with a medial epicondylectomy and a decompression of the median and ulnar nerves at the right wrist.
16. On July 22, 2003, Plaintiff reported a painful popping sensation during physical therapy for his hand, after which Dr. Osier, an associate of Dr. Baker, suspended physical therapy. At an August 21, 2003 visit to Dr. Barron, Plaintiff complained of continuing numbness, tingling and pain in the right elbow and hand.
17. Dr. Barron was not able to proceed with shoulder therapy due to the hand and elbow surgery and post-surgical problems. Dr. Barron certified Plaintiff out of work due to his shoulder condition.
18. Dr. Barron subsequently attempted physical therapy for Plaintiff's shoulder, but therapy resulted in increased pain to the right hand and elbow. Dr. Barron referred Plaintiff to Dr. W. Alan Ward, an orthopedic hand specialist at Miller Orthopaedic Clinic. Dr. Barron did not feel that Plaintiff was ready to return to work based on the shoulder condition until Plaintiff had had an opportunity to complete a work hardening program.
19. As of February 10, 2004, Plaintiff had been unable to complete a work hardening program primarily due to pain in his wrist and his elbow injuries. As a result, Dr. Barron was unable to assess Plaintiff's ability to work. On February 10, 2004, Plaintiff also complained of continuing problems with his left knee. The examination of Plaintiff's right shoulder on that date revealed mild crepitus and mild pain with impingement. His cuff strength had improved.
20. On March 25, 2004, Dr. Ward diagnosed Plaintiff as suffering from persistent ulnar neuropathy following a large medial epicondylectomy with possible ulnar collateral ligament complex insufficiency and a loose body in the elbow. An MRI indicated abnormal signal morphology at the epicondyle and a tear of the ulnar collateral ligament complex. An *Page 7 
electrodiagnostic study confirmed a compression neuropathy involving the right ulnar nerve across the elbow. Dr. Ward prescribed surgery to include anterior submuscular transposition of the right ulnar nerve, advancement of the flexor pronator at the right elbow, re-release of the right carpal tunnel and ulnar neurolysis at the right wrist. Dr. Ward performed this surgery on May 14, 2004.
21. Dr. Barron opined that at the time of recovery from the wrist and elbow surgery, with consequent disuse of the shoulder, Plaintiff would likely have residual weakness, decreased range of motion and pain.
22. Dr. Barron's opinion supports Plaintiff's credible testimony that although his shoulder was a bit sore, but not especially painful, his shoulder strength was far from his pre-injury condition.
 c. Second Shoulder Injury Left Knee
23. Plaintiff testified that in the fall of 2004, he was going down his back steps at home when his left knee "gave out" and he fell, landing on his right shoulder. This injury was immediately painful.
24. Plaintiff returned to Dr. Barron who diagnosed a likely recurrent rotator cuff tear, requiring additional shoulder surgery. He certified that Plaintiff should not return to work until re-evaluated.
25. Dr. Barron also examined Plaintiff's left knee at the time of the second injury. Dr. Barron suspected a meniscus tear caused Plaintiff to fall. He noted a positive McMurray's test, which is a provocative test for a meniscus tear and objectively confirmed tenderness along the joint line where the meniscus is located. It is undisputed that whether Plaintiff's meniscus is torn cannot be determined without an updated MRI. *Page 8 
26. Defendants arranged an examination of Plaintiff's shoulder for a second opinion by Dr. James Dreese, an orthopaedic surgeon. Dr. Dreese concurred that a revision rotator cuff repair was indicated.
27. Defendants denied payment for this surgery.
28. Upon re-evaluation of Plaintiff's left knee on October 26, 2004, Dr. Dickerson opined that it was a possibility, but not a probability, that the knee "gave out" because of medical conditions from the January 17, 2002 injury. Dr. Dickerson's testimony establishes that the earlier injury could have been a factor but was not a substantial factor in Plaintiff's knee giving away in the fall of 2004.
29. Dr. Dickerson testified that many possibilities could explain Plaintiff's knee "giving out," and if a leg is injured and never rehabilitated, it would likely always remain a little weak. He testified that a Grade II finding on the MRI of the knee in 2002 could actually represent a meniscus tear, which could have worsened between 2002 and 2004 when Plaintiff fell. Also, various other conditions that can lead to a knee "giving way" include weak quadriceps muscles, any kind of knee injury or knee surgery and torn cartilage, especially if it is a significant tear. Dr. Dickerson recommended an additional cortisone injection and he permanently restricted Plaintiff from squatting.
30. At the time of Dr. Dickerson's deposition testimony, the parties did not have Dr. Barron's medical note of February 10, 2004, which documents Plaintiff's report of continuing problems with his knee, or Dr. Barron's notation in the record that Plaintiff had a positive McMurray's test. Neither party requested additional time, post hearing, to submit Dr. Barron's note to Dr. Dickerson to determine if it would affect his previous opinion testimony. *Page 9 
31. The greater weight of the evidence does not establish the etiology of Plaintiff's knee "giving out" which led to his second injury. Because Defendants have denied liability and compensability for the knee and shoulder re-injury, a comprehensive plan has not been developed to determine what residual conditions Plaintiff may have or have developed since the initial injury, especially as to the issue of a potential meniscus tear.
 d. Disability
32. The parties requested and Dr. Ward provided a permanent partial impairment rating for Plaintiff. Dr. Ward issued a rating of 25 percent permanent partial impairment of Plaintiff's right arm as a result of his elbow and wrist surgeries, specifically not including the shoulder. He gave permanent restrictions for the right arm and hand of no lifting, pushing or pulling over 20 pounds.
33. Plaintiff experienced progressive pain and returned to Dr. Ward again on July 25, 2005, at which time Dr. Ward prescribed Neurontin. On October 27, 2005, Dr. Ward provided permanent restrictions of no lifting more than 20 pounds with the right arm and assessed Plaintiff as having a 35 percent permanent partial impairment of the right arm, excluding the shoulder. Dr. Ward discharged Plaintiff from his care.
34. On January 25, 2006, Dr. Barron reconfirmed that revision of Plaintiff's rotator cuff tear was necessary and that failure to perform this surgery could lead to additional problems, including a need for shoulder replacement. Dr. Barron also testified that Plaintiff's left knee should be repaired if necessary, to prevent any further falls that could re-injure the shoulder after it is repaired. Plaintiff had not had either his knee or his shoulder repaired at the time of the hearing before the Chief Deputy Commissioner. *Page 10 
35. Defendants introduced a videotape of Plaintiff's activities as observed by a private investigator. The testimony and videotape demonstrate that Plaintiff can operate a motor vehicle, walk and carry on some normal physical activities. The video showed Plaintiff keeping company with a friend, at the latter's place of business, who was working on an automobile. The Full Commission finds that the private investigator's testimony and the videotape do not establish by the greater weight of the evidence that Plaintiff was working or performing any tasks in a sustained manner sufficient to prove that he is capable of suitable employment. In fact, the videotape showed Plaintiff walking with a slight limp of the left leg and, although he is right hand dominant, picking up something from the back of his truck with his left hand. These observations corroborate a finding that Plaintiff's report of injuries is credible.
36. As of January 16, 2006, Plaintiff would not have been able to return to his work for Defendants even excluding the effects of the second shoulder injury. Dr. Ward's prescribed restrictions limited Plaintiff to employment involving non-repetitive use of his right upper extremity. Dr. Barron opined that Plaintiff must also avoid employment involving repetitive use of his left hand, due to the development of carpal tunnel syndrome in Plaintiff's left hand. Dr. Barron related Plaintiff's carpal tunnel syndrome to his compensable injury.
37. Based on the greater weight of the evidence it would be futile for Plaintiff to seek suitable employment within his restrictions, given his age, education and physical limitations. In addition, Defendants never offered Plaintiff alternative employment.
 e. Psychological Conditions
38. The greater weight of the evidence establishes that throughout the course of his injuries, Plaintiff experienced psychological problems, including, but not limited to, depression and anxiety. Plaintiff's physicians provided prescription medications for his emotional symptoms.
39. The greater weight of the evidence establishes that the underlying causes of Plaintiff's emotional imbalance are multi-factorial, including many factors that are unrelated to his work-related injuries. However, the medical evidence establishes that part of Plaintiff's depression *Page 11 
and anxiety is related to the pain arising from his injury.
 f. Credit
40. Defendants, in the Pre-Trial Agreement, contend that they should receive a credit for payments made under a short-term and/or long-term disability plan they provided to Plaintiff. No evidence as to the issue was introduced. Plaintiff testified, without contradiction, that the disability plan administrator is demanding that he reimburse long-term disability payments. The record is devoid of any evidence of whether any reimbursement has actually been made.
41. Defendants, in the Pre-Trial Agreement, alleged that Plaintiff was non-compliant with vocational rehabilitation. No significant evidence was introduced as to this issue.
42. Defendants, in the Pre-Trial Agreement, contend that Plaintiff prosecuted his claim without reasonable ground to do so. The Full Commission finds as reflected in this Opinion and Award that Defendants' position is unpersuasive.
 g. Attorney Fees
43. Plaintiff filed a Form 18 on September 11, 2003, establishing his claim for an injury to his left knee. Defendants timely filed a Form 61, denying Plaintiff's claim. Defendants denied the claim on three grounds: (a) improper notice to the employer; (b) claimant is not suffering from a disability as defined by the Act; and (c) there was no evidence of medical treatment or a specific incident. *Page 12 
44. The greater weight of the evidence establishes that Defendant-Employer's insurance carrier did not conduct a proper investigation of Plaintiff's claim related to his knee prior to filing the Form 61 as evidenced by the defenses raised by Defendants. An interview with Plaintiff or his counsel would have disclosed that (a) Plaintiff received medical treatment for his knee; (b) Plaintiff alleged a specific accident that was witnessed; and (c) Defendant-Employers' management had effectively directed Plaintiff not to file a workers compensation claim.
45. Even assuming that Defendant-Employer's insurance carrier was not remiss in initially denying the claim, subsequent information provided to the insurance carrier eliminated any reasonable doubt as to compensability of the initial claim. Defendants' failure to subsequently accept the initial injury to Plaintiff's knee and to defend this aspect of Plaintiff's claim through hearing was unfounded and litigious.
46. Defendants' defense of the Plaintiff's re-injury to his shoulder involves legitimate questions of fact and law. In contrast to its denial of Plaintiff's initial knee injury, Defendant-Employer's insurance carrier accepted Plaintiff's shoulder injury and only defended whether the second injury is compensable under the Act.
47. Plaintiff's counsel did not provide an itemized statement of services related to the prosecution of Plaintiff's claim for benefits related to the initial left knee injury to allow calculation of attorney fees under N.C. Gen. Stat. § 97-88.1.
48. Plaintiff's counsel petitions for attorney fees of twenty-five percent (25%) of all disability benefits awarded. Counsel filed both claims for Plaintiff, established disability payments and has subsequently prosecuted this action to a successful conclusion. The attorney fees petitioned for are not unreasonable under the circumstances of this case. *Page 13 
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW a. Knee Injury
1. Plaintiff suffered an injury by accident to his left knee in the course and scope of his employment with Defendants on January 17, 2002, which is compensable under the Act. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has proven by the greater weight of the evidence that he has residual symptoms related to his left knee that warrant medical, surgical, hospital, nursing, rehabilitative services, medicines, sick travel, and other treatment, including medical and surgical supplies, as may reasonably be required to effect a cure or give relief or will tend to lessen the period of disability. The greater weight of the evidence establishes that Plaintiff may have a meniscus tear that reasonably requires examination and that, at the least, further injection is needed for relief. N.C. Gen. Stat. §§ 97-2(19) 97-25.
3. The Commission may, in its discretion, designate a treating physician. Dr. Barron, who is treating Plaintiff's shoulder and knee injuries, is designated to examine the left knee and order any further treatment that may be warranted. N.C. Gen. Stat. §§ 97-2(19) 97-25.
 b. Fall, Knee and Second Shoulder Injury
4. When the primary injury is shown to have arisen out of an injury by accident, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause. Thus, a subsequent injury is *Page 14 
compensable if it is the direct and natural result of the compensable primary injury. Starr v. Charlotte Paper Co., 8 N.C. App. 604 (1970). Plaintiff sustained a prior, compensable injury to his left knee and was conservatively treated and given permanent restrictions. Although Plaintiff returned to full-time employment with Defendant-Employer, he still complained about having pain in his knee. Plaintiff fell in 2004, when he was walking down stairs at home, and his knee gave way causing him to fall and injure his shoulder. Dr. Dickerson testified that if a leg is injured and never rehabilitated, it would likely always remain a little weak, but it was a possibility, not a probability that the knee give away was related to Plaintiff's January 17, 2002 injury. Therefore, Plaintiff's second shoulder injury is not a direct and natural consequence of his January 17, 2002 knee injury. The Parsons presumption is inapplicable to the facts of this case. Parsons v. Pantry, Inc.,126 N.C App. 540 (1997).
5. "Unless the subsequent aggravation is the result of an independent intervening cause attributable to claimant's own intentional conduct, the subsequent aggravation of the primary injury is also compensable."Roper v. J. P. Stevens Co. 65 N.C. App. 69 (1983). An "intervening cause" in the context of the Act is an occurrence "entirely independent of a prior cause. When a first cause produces a second cause that produces a result, the first cause is a cause of that result."Heatherly v. Montgomery Components, Inc., 71 N.C. App. 377, 380,323 S.E.2d 29, 30 (1984). Even if Plaintiff's knee giving way is an "intervening cause," there is no evidence that Plaintiff's fall was intentional. Horne v. Universal Leaf Tobacco Processors,119 N.C. App. 682, 459 S.E.2d 797, disc. review denied, 342 N.C. 192,463 S.E.2d 237 (1995).
6. The undisputed evidence supports a conclusion that Plaintiff re-injured his rotator cuff and requires medical, surgical, hospital, nursing, and rehabilitative services, and medicines, sick travel, and other treatment, including medical and surgical supplies, as may reasonably *Page 15 
be required to effect a cure or give relief or will tend to lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 c. Disability
7. In order to receive disability compensation, the employee has the burden of proving the existence of that disability and its extent.Perkins v. U.S. Airways, ___ N.C. App. ___, 628 S.E.2d 402 (2006). The burden may be met in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment[;] or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. LowesProduct Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457
(1993). In the instant case, because Defendants have denied liability and compensability for the knee and shoulder re-injury, a comprehensive plan has not been developed to determine what residual conditions Plaintiff may have or have developed since the initial injury. On January 25, 2006, Dr. Barron reconfirmed that revision of Plaintiff's rotator cuff tear was necessary and that failure to perform this surgery could lead to additional problems, including a need for shoulder replacement. Dr. Barron also testified that Plaintiff's left knee should be repaired if necessary, to prevent any further falls that could re-injure the shoulder after it is repaired. Plaintiff had not had either his knee or his shoulder repaired at the time of the hearing before the Chief Deputy Commissioner. Defendants have paid temporary total disability to Plaintiff from the date he went out of work through the *Page 16 
date of hearing before the Deputy Commissioner. The medical evidence supports a conclusion that Plaintiff's conditions continue to preclude suitable employment. As of January 16, 2006, Plaintiff would not have been able to return to his work for Defendants even excluding the effects of the second shoulder injury. Dr. Ward's prescribed restrictions limited Plaintiff to employment involving non-repetitive use of his right upper extremity. Dr. Barron opined that Plaintiff must also avoid employment involving repetitive use of his left hand, due to the development of carpal tunnel syndrome in his left hand related to his injury. Considering his restrictions and physical limitations and his vocational factors, it would be futile for Plaintiff to seek suitable employment at this time. Plaintiff has satisfied his burden of proof under Russell. Id. N.C. Gen. Stat. § 97-29.
8. Plaintiff's average weekly wage is stipulated to be $653.80. N.C. Gen. Stat. § 97-2(5).
 d. Psychological Conditions
9. The greater weight of the medical evidence establishes that Plaintiff's psychological conditions were caused, in part, by his work related injuries and, therefore, treatment of his psychological condition is compensable under the Act. See Cooke v. P.H.Glatfelter/Ecusta, 130 N.C. App. 220, 502 S.E.2d 419 (1998).
 e. Credit
10. Defendants have presented insufficient evidence to establish their claims for: (a) credit related to short term / long term disability payments; (b) Plaintiff's alleged non-compliance with rehabilitation efforts; or (c) unfounded prosecution of this workers' compensation action; and therefore these claims should be denied. N.C. Gen. Stat §§ 97-42; 97-25; 97-88.1. *Page 17 
 f. Attorney Fees
11. Defendants' failure to accept the initial injury to Plaintiff's knee as compensable and its continued defense of Plaintiff's injury to his knee on January 17, 2002, was unfounded and litigious for which Defendants should be required to pay Plaintiff's reasonable attorney fees in quantum merit. There is no evidence in this record from which to determine the value of counsel's services related to this aspect of Plaintiff's claim.
12. Defendants' defense of Plaintiff's re-injury to his shoulder involves legitimate questions of fact and law. In contrast to its denial of Plaintiff's initial knee injury, Defendant-Employer's insurance carrier accepted Plaintiff's shoulder injury and only defended whether the second injury is compensable under the Act.
13. Defendants' defense of the remaining issues in this workers' compensation action was reasonable. N.C. Gen. Stat. § 97-88.1;Sparks v. Mountain Breeze Restaurant Fish House, Inc.,55 N.C. App. 663, 286 S.E.2d 575 (1982).
14. Plaintiff's attorney has provided valuable legal services including, but not limited to, the trial of this matter. Plaintiff's contract of employment of his counsel providing for an attorney fee of twenty-five percent (25%) of disability benefits awarded is not unreasonable and should be approved. Specifically, counsel established disability benefits for Plaintiff prior to the trial of this action. N.C. Gen. Stat. § 97-90.
15. In its discretion, the Commission may tax costs. Given the results in this case, Defendants should bear the costs. N.C. Gen. Stat. § 97-80.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following: *Page 18 
 AWARD
1. Defendants shall continue to pay Plaintiff temporary total disability payments at the rate of $653.80, until further Order of the Commission. The payment of disability benefits is subject to the reasonable attorney fees provided for hereinafter.
2. Dr. Barron is designated as Plaintiff's authorized treating physician for Plaintiff's knee and shoulder injuries until further Order of the Commission or mutual agreement by the parties.
3. Dr. Barron may perform all care and treatment reasonably necessary, including authorization of prescription medications, as long as such care and treatment is reasonably necessitated by the injuries or complications thereof sustained by Plaintiff. Dr. Barron may also make appropriate referrals for additional medical and rehabilitative care and treatment provided the need for the services are necessitated by the injuries or complications thereof sustained by Plaintiff including referrals for psychological treatment.
4. Defendants shall pay for all such care and treatment when: (a) the bills for such services have been filed and approved in accordance with law and procedures adopted by the Commission.
5. Plaintiff shall pay a reasonable attorney fees of twenty-five percent (25%) of the compensation due Plaintiff from the day he was removed from work and continuing. Plaintiff shall pay this fee by Defendants deducting every fourth weekly disability payment due Plaintiff from the entry of this Award and paying the same to counsel of record. As to the attorney fee for weekly disability payments actually paid prior to this Award, counsel shall petition the Commission for payment of the fee at such time as Plaintiff's permanent disability is determined. *Page 19 
6. With respect to N.C. Gen. Stat. § 97-88.1 attorney fees, Plaintiff's counsel shall submit an itemized statement of services and times expended only in the prosecution and defense of Defendants' denial of the initial injury to Plaintiff's knee. Further Orders will establish the amount of the fee and the procedure for payment of that fee by Defendants.
7. Defendants shall pay the costs.
This the ___ day of February 2007.
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________________ THOMAS J. BOLCH COMMISSIONER *Page 1